IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ANA JULIA MENDEZ | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN,[1] | : | |
| Commissioner of the | : | 12-4693 |
| Social Security Administration | : | NO. 12-4963 |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    August  8  , 2013

This action was brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final

decision of the Commissioner of the Social Security Administration (the "Commissioner"), which

denied the application of Ana Julia Mendez for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"). Presently before the Court

is Plaintiff's Brief and Statement of Issues in Support of Plaintiff's Request for Review ("Pl. Br.")

(Doc. No. 13); Defendant's Response to Request for Review of Plaintiff ("Def. Br.") (Doc. No.

16); Plaintiff's Reply Brief ("Pl. Reply") (Doc. No. 19); and the record of the proceedings before

the Administrative Law Judge ("ALJ") and the Appeals Council (hereinafter "R."). Plaintiff asks

the Court to reverse the decision of the Commissioner and order an award of benefits.

Alternatively, she asks the Court to vacate the Commissioner's final administrative decision and

remand the matter for further development and review. The Commissioner seeks the entry of an

order affirming the decision of the ALJ that Plaintiff was not disabled. For the reasons set out

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be
substituted for Michael J. Astrue as the defendant in this suit.

1

below, we recommend that the Court remand the matter for further proceedings.

## I.      FACTUAL AND PROCEDURAL HISTORY

Mendez protectively filed the application giving rise to this litigation on March 15, 2008. (R. 46, 67-73.)[2]  She had some education in Puerto Rico but is not fluent or literate in English. (R. 92, 104, 234-36.)   She last worked as a warehouse packer in 1998.   She was 42 years old on her alleged disability onset date, January 25, 2008.   (R. 67.)   She was separated and lived alone in a rented room in a house in Philadelphia.   (R. 445.)

In a disability report that she completed in April 2008 with the assistance of counsel, Mendez asserted that her ability to work was limited by depression, anxiety, insomnia, back problems, asthma, and ADHD, which caused problems with sitting, standing, lifting, carrying, bending, kneeling, and various postural activities.   She also referenced nervousness, fatigue, headaches, and problems with memory and concentration.   (R. 92-93.)

At the time of her application, Mendez had been followed in the outpatient clinic at Kensington Hospital for asthma for two years.   Physician Nimidia Oviedo, M.D., and the clinic's nurse practitioner documented complaints of asthma throughout 2006 through 2008.   (R. 127-48.) They also noted periodic complaints of low back pain (*e.g.,* R. 128 (2/23/06)), for which they referred her to orthopedist William E. Beatie, M.D. [3] (*e.g.,* R. 129 (5/15/08)), and documented

_____

[2]  The record indicates that a previous application for SSI, as well as DIB benefits, was filed in April of 2006 and denied.   *See* R. 78.   While that application was not re-opened, one medical report that appears to have been created for that adjudication was made part of the record with respect to this 2008 application.   *See* R. 234-39 (report to state agency of psychological consultative examination conducted on 10/26/06).

[3]  Mendez was seen by Dr. Beatie from 2008 to 2010, when he left the practice with which he was affiliated.   His records memorialize Mendez's complaints of back pain and his diagnosis of chronic thoracolumbar pain.   (R. 397-408.)

treatment for a calcaneus spur in the left foot in 2007. (R. 133-38.) Mendez continued to treat with Dr. Oviedo throughout 2009 and 2010 for asthma flare-ups and other ailments. (R. 409-31.) She would also complain to her of "feeling weak and down all the time." (*E.g.,* R. 412 (11/23/09).) Dr. Oviedo assessed Plaintiff's major problems as severe, intermittent asthma and depression with anxiety. (*E.g.,* R. 412 (11/23/09) 414 (9/28/09).)

Upon Mendez's initial visit at the Kensington clinic on February 23, 2006, the nurse practitioner also noted depression among Mendez's diagnoses and ordered a "psych consult." (R. 128.) The record reflects that Mendez then sought mental health treatment and was reporting to practitioners at the COMHAR outpatient clinic in June 2006 that she felt sad and nervous and was having difficulty with sleep. (R. 254-77.) Following a comprehensive biopsychosocial evaluation, she was diagnosed with Major Depressive Disorder, Severe and Recurrent. (R. 274.) Pursuant to the treatment plan developed at that time and over the next two years, Mendez was prescribed a variety of medications, including various combinations of Ambien, Lexapro, Remeron, Zoloft, Abilify, Wellbutrin, Cymbalta, Topomax, Ritalin, and Strattera. (R. 240-78, 288-330.) Mendez also participated in psychotherapy with Nurys Gomez, M.H.P., on a bi-weekly, or sometimes weekly, basis, all under the supervision of psychiatrist Maria Zoratti, M.D., who assumed responsibility for her care beginning in January 2007. (R. 156-233.) Dr. Zoratti completed a report and a check-off form concerning Mendez's functional limitations at the request of the state agency on June 4, 2008, at which point Plaintiff had been seen at COMHAR for two years and had been under Dr. Zoratti's supervision for 17 months. (R. 279-83, 284-86.)

Mendez received subsequent mental health treatment at Cognitive-Behavioral Services,

Inc., under the supervision of psychiatrist Onilda Herran, M.D.[4]  Upon her initial evaluation in April 2009, she complained of feeling increasingly depressed, easily frustrated, isolated, forgetful, and experiencing insomnia.  (R. 372-73.)  Dr. Herran observed Mendez as having a "restricted" affect but noted that she reported her mood as "calm."  (R. 377.)  She also noted Mendez's attention and concentration, as well as her immediate memory and recent recall, as "impaired."  (R. 377-78.)  Dr. Herran diagnosed her with Major Depressive Disorder, Recurrent, Severe, Without Psychosis, and with PTSD, Chronic.  (R. 382.)  Although Dr. Herran ordered weekly psychotherapy and planned to manage Mendez's medications, she characterized the "expected outcome" of her recommended interventions as "guarded."  (R. 384.)

After her claim was initially denied by the state agency, Mendez requested a hearing, which was held on April 1, 2010.  She appeared with counsel and testified that her inability to work since January 2008 was due to asthma and family problems that required her to leave Puerto Rico.  (R. 446.)  She stated that the asthma prevented her from being able to use cleaning products, caused shortness of breath, and made it difficult for her to climb stairs.  (R. 446-47.)  She also reported that she had constant back and leg pain which kept her from walking more than a block.  (R. 449.)  With respect to her mental health, she reported that she began treatment at COMHAR because she was "always thinking about the things that [she'd] had happen to [her]," including past abuse, and was "always sad."  (R. 447.)  She also testified that she never felt like doing anything, would go "months" without grocery shopping, and relied upon a sister to do her laundry.  (R. 447.)  In response to a question from the ALJ regarding any change in her

---

[4]  The record does not reflect any continued treatment by Mendez at COMHAR after Dr. Zoratti submitted her records in June 2008.  We are unaware of the record providing any concrete explanation for why Mendez switched providers, but we note that her psychotherapist at both clinics was Nurys Gomez, suggesting that she may have followed her from one clinic to the other.

depression since her alleged onset date of January 2008, she testified that she thought it had "gotten better" with treatment, although when asked to explain how, she responded that she was "always up and down."  (R. 459.)  She testified that she was able to take care of her personal needs, but that she did not have the will to do so on a daily basis.  (R. 452.)  She explained that she could cook using the microwave only and that her only hobbies were listening to Christian music and reading the Bible, as she did not feel like doing anything else.   (R. 452-54.)

The ALJ closed the record at the conclusion of the hearing and, on April 9, 2010, issued her decision.  She found Mendez not disabled based upon her finding that she retained the residual functional capacity to perform a restricted range of work at the light exertional level and could make a successful adjustment to other work that exists in significant numbers in the national economy.  (R. 35-40.)  The Appeals Council found no basis to set aside the ALJ's decision, rendering it the final decision of the Commissioner.   (R. 15-17.)   This litigation followed.

## II.    STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).   Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence."  *Rutherford*, 399 F.3d at 552.   The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence.  *Richardson*, 402 U.S. at 390 (citing 42 U.S.C. § 405(g)); *Rutherford*, 399 F.3d at 552.   The review of legal questions presented by the Commissioner's final decision, however, is plenary.  *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d

Cir. 1999).

**III.   DECISION UNDER REVIEW**

The issue before the ALJ at the time of the April 9, 2010 decision was whether Mendez had

been disabled within the meaning of the Act at any time since the March 5, 2008 date of her SSI

application.   In making this determination, the ALJ relied upon the five-step sequential evaluation

process set forth in 20 C.F.R. § 416.920(a).   At Step One, the ALJ found that Mendez had not

engaged in substantial gainful activity at any time since her application date.   (R. 32 & Finding

No. 1.)   At Step Two, she found that Mendez demonstrated that she suffered from severe

medically-determinable impairments, e.g., impairments that caused functional limitations and had

more than a *de minimus* effect on her ability to perform basic work activities.   (R. 32 & Finding

No. 2.)   At Step Three, the ALJ concluded that Mendez did not have an impairment or

combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1 and therefore could not establish her entitlement to benefits on that

basis, requiring that the evaluation process continue.   (R. 32 & Finding No. 3.)   Plaintiff does not

challenge these findings.

The ALJ then proceeded to make a finding as to Mendez's residual functional capacity

("RFC"), which is defined as "the most [a claimant] can still do despite [her] limitations," 20

C.F.R. § 416.945(a)(1).   She made the following finding:

> **4.   After careful consideration of the entire record, I find that
> the claimant has the residual functional capacity to perform
> light work as defined in 20 CFR 416.967(b) except she can lift
> and carry 20 pounds occasionally and 10 pounds frequently,
> stand and walk 4 hours in an eight-hour day, and sit 6 hours in
> an eight-hour day.   She is able to frequently, but not
> constantly, push and pull with the left lower extremity and can
> occasionally climb ramps and stairs, but should never climb
> ladders, ropes, or scaffolds.   She can occasionally balance,**

**stoop, kneel, crouch, and crawl but must avoid frequent exposure to extreme heat, extreme cold, wetness, humidity, vibration, fumes, odors, dust, gases, poor ventilation, and hazards including machinery and heights. The claimant is limited to unskilled work with routine and repetitive tasks, no public interaction, and only occasional interaction with coworkers and supervisors.**

(R. 35, Finding No. 4 (bold in original).)   At Step Four, the ALJ found that Mendez was not capable of performing her past relevant work as a warehouse packer.   (R. 39, Finding No. 5.) Proceeding to Step Five, however, and given Mendez's age, work experience, RFC, and testimony offered at the hearing by a vocational expert ("VE"), the ALJ concluded that there were jobs existing in the regional and national economy such as assembler, inspector, and small product assembler that Mendez could perform.   (R. 39-40 & Finding No. 9.)   Accordingly, she found that Mendez was not disabled at any time from her application date to the date of her decision.   (R. 40, Finding No. 10.)

## IV.    DISCUSSION

Mendez asserts three bases for remand.   First, she asserts that the ALJ, "without explanation," "disregarded the well supported report and opinion" of Dr. Zoratti that Mendez "was disabled."[5]   (Pl. Br. at 5.)   Second, she argues more broadly that the ALJ "erroneously rejected"

---

[5]   There is some disagreement reflected in the parties' briefs as to whether Plaintiff was arguing that Dr. Zoratti rendered an opinion on the "ultimate issue" of disability to which the ALJ owed deference.   We do not perceive Plaintiff to challenge the notion that it is the ALJ who is charged with making the determination as to whether a claimant is "disabled" as defined in the Act.   We also note that Dr. Zoratti was not asked about, nor do we see that she has offered an opinion on the subject of, whether Plaintiff was "disabled."   Rather, she offered a report by answering certain questions on a form provided by the state agency and completed a Medical Source Statement reflecting her opinion about how Plaintiff's mental impairments functionally limit her.

When the VE at the hearing was asked about a hypothetical individual with the limitations described by Dr. Zoratti, she indicated that there were no occupations that could be performed by such a hypothetical individual.   *See* R. 462.   As a result, if Dr. Zoratti's opinion were credited

*(continued...)*

the well-supported opinions of her treating psychiatrists --- referring here not only to an opinion of Dr. Zoratti but also one of Dr. Herran --- "that establish that Plaintiff was disabled," in that the ALJ allegedly did not adhere to the Commissioner's policies regarding the weight due to treating physician opinion evidence. (Pl. Br. at 7.) Finally, she contends that the ALJ's "rejection of [her] subjective testimony" contravened applicable regulations. (Pl. Br. at 13.)

### A. The ALJ's failure to discuss the report accompanying Dr. Zoratti's medical source statement form

Plaintiff first contends that the ALJ's decision should be vacated because, in reconciling the mental health evidence in formulating her RFC finding, she "failed to address" a "report and opinion" offered on June 4, 2008 by Dr. Zoratti, Mendez's then-treating psychiatrist at COMHAR. For the reasons set out below, we agree that the ALJ's omission in this regard constitutes reversible error.

The record before the ALJ contained records of two years of treatment that Mendez received at the COMHAR clinic. Although the June 2006 intake evaluation of Mendez was conducted by another psychiatrist, Dr. Zoratti appears to have been the psychiatrist in charge of Plaintiff's treatment from January 10, 2007 onward. (R. 241-43, 288-330.) At the request of the state agency, Dr. Zoratti completed a report on June 4, 2008 providing her diagnoses, describing Mendez's then-current mental status, and describing Mendez's functional limitations in various respects, including activities of daily living, social functioning, and concentration, persistence and pace. This 4-page report was marked as a single exhibit with another document presented by the state agency to Dr. Zoratti: a 3-page Medical Source Statement of Ability to Do Work-Related

_____

fully, it would presumably lead to a finding that Mendez was disabled.

Activities (Mental) form, in which Dr. Zoratti could rate the degree of restriction for various work-related mental activities along a continuum of "none" to "extreme." (R. 280-83, 285-86.)

In the report that accompanied the Medical Source Statement, Dr. Zoratti set out diagnoses of "ADHD, inattentive type" and "Major Depressive Disorder recurrent severe." (R. 280.) She outlined the various medications that had been prescribed since 2006, noting where there was "still depression[,] not improved" after medications were changed in May 2007, for example, or "still severe anxiety & depression" after a subsequent alteration in the medication regime. (*Id.*) She noted that Mendez was sad much less and was "able to deal with her anxiety." (*Id.*) In her mental status examination, she described Mendez's mood and affect as sad, noting that she was preoccupied and "worried about her life." (R. 281.) Mendez's concentration, recent memory, and immediate retention and recall were described as "poor but improved with meds." (R. 281-82.) Dr. Zoratti described "severe frequent" panic attacks, such that "sometimes she can not go out of the house," although she characterized Mendez as doing better with the panic attacks in the last two months after having been "extremely handicapped by them" before. (R. 282.) She reported that Mendez demonstrated difficulties performing daily activities on a sustained basis, as she "could not go out, [due to] severe poor energy or anxiety." (*Id.*) She answered that Mendez had demonstrated difficulties in social functioning as well as in the various aspects reflecting concentration, persistence, and pace. (R. 282-83.) As to the latter, she noted that "[Mendez] presented with severe poor concentration and she was losing [her things] all the time" but was "no[w] a little better." (R. 283.) She characterized Mendez's response to the current medication regimen as "good,"[6] but still rated her prognosis as "poor because [of] very chronic and very

---

[6] At that time, Mendez was on *seven* medications for the diagnosis that the COMHAR
*(continued…)*

severe depression." (*Id.*) Where given the opportunity to "describe any other pertinent clinical observations," she added: "She is doing well by taking meds that are improving her[.] [B]efore she was a candidate for State hospital[.] [N]ow she can live at home." (*Id.*)

In the portion of the decision in which the ALJ reconciled various aspects of the medical opinion evidence, from treating physicians as well as consultative examiners and state agency reviewing physicians, she wrote:

> Dr. Zoratti completed a mental medical source statement on June 4, 2008. It was reported that the claimant had extreme limitations in understanding and remembering detail[ed] instructions, carrying out detailed instructions, responding appropriately to work pressures in a routine work setting, and responding appropriately to changes in a usual work setting. It was noted that [t]he claimant had marked limitations in making judgments on simple work-related decisions and interacting appropriately with supervisors and co-workers. (Exhibit 7F.)[7] Little weight is given to Dr. Zoratti's opinion because it is inconsistent with mental health treatment records at the time of the opinion that indicated that the claimant's major depressive disorder was in partial remission. (Exhibit 8F at 1-19, 6, 9, 12, 16).[8]

(R. 38.)

---

psychiatrists had coded as "Major Depressive Disorder, Recurrent, In Partial Remission" since September 12, 2006. *See* R. 288 (listing orders for Ambien, Klonopin, Prozac, Abilify, Strattera, Wellbutrin, and Cymbalta); R. 250 (progress note of 9/12/06 completed by Dr. Draper, providing diagnostic code of 296.35 for Major Depressive Disorder, Recurrent, In Partial Remission and prescribing Ambien and Zoloft). *Cf.* R. 274 (Comprehensive Biopsychosocial Evaluation of 6/20/06 completed by Dr. Fabiani, providing diagnostic code of 296.3 and identifying diagnosis as Major Depressive Disorder, Severe and Recurrent).

[7] Exhibit 7F in the record before the ALJ contains both the 4-page report, in question and answer format, and the Medical Source Statement form. Both documents were completed by Dr. Zoratti and dated June 4, 2008. (R. 280-86.)

[8] Exhibit 8F is comprised of the medication lists and Dr. Zoratti's psychiatric progress reports of Mendez's treatment at COMHAR from 2/21/07 to 6/4/08. (R. 289-330.)

Plaintiff takes the position that the decision reflects that the ALJ "completely disregarded Dr. Zoratti's *report*" --- as opposed to the Medical Source Statement accompanying it that the ALJ *did* describe. (Pl. Br. at 6 (emphasis added).) She notes that the report is not mentioned by the ALJ in her recitation of the evidence or in the rationale for her decision. She argues that "the ALJ's failure to mention this report" contributed to her "flawed analysis of" the Medical Source Statement, since the opinions in the Medical Source Statement were supported by the explanations provided in Dr. Zoratti's accompanying report. (Pl. Br. at 6.) She contends that this "complete failure to mention the existence of Dr. Zoratti's report and opinion constitutes clear error of law." (*Id.*) The Commissioner answers, somewhat non-responsively, that the ALJ did not disregard evidence from Dr. Zoratti, as she explicitly discussed the medical source statement and the COMHAR treatment records. (Def. Br. at 8.) The Commissioner also notes that "[a]n ALJ is not obligated to explicitly refer to and analyze every piece of evidence." (*Id.*) She asserts that, because the information provided in Dr. Zoratti's report "was also contained in her progress notes and medical source [statement]," the ALJ was "not … required to specifically address the report that accompanied Dr. Zoratti's medical source statement." (*Id.*)

We find Plaintiff's argument more persuasive than the Commissioner's on this point. Certainly, as the Commissioner notes, an ALJ need not refer to "every piece of evidence." (Def. Br. at 8, citing *Fargnoli v. Massanari*, 247 F.3d 24, 42 (3d Cir. 2001) and *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203-05 (3d Cir. 2008).) Here, however, the evidence was a report of a treating psychiatrist that provided an assessment of Mendez's condition over time and context for the opinions expressed in the Medical Source Statement. It suggests, for example, that notations in the progress notes that Mendez was "doing well" might be offered against the backdrop of Mendez's "5 suicidal attempts[, the] last 4 years ago." (R. 280 (6/4/08 Report).) It provides a

way to reconcile Dr. Zoratti's opinions regarding the severity of Plaintiff's limitations with the diagnosis recorded in the progress notes of the Major Depressive Disorder as being "in partial remission," as Dr. Zoratti noted a "long history of depression and severe anxiety" (R. 280) and referred to the chronicity of Mendez's depression (R. 283), even as she was doing better with medication. *See also* R. 282 (dating improvements in anxiety to "the last 2 months"). *See generally* American Psychiatric Association, *Severity and Remission in Major Depressive Episode* http://psychcentral.com/lib/severity-and-remission-in-major-depressive-episode/000631, (last visited 7/31/13) (explaining that "Major Depressive Disorder" may be specified as being "In Partial Remission" either where some symptoms of a Major Depressive Episode are still present but full criteria are no longer met, or where there are no longer any significant symptoms of a Major Depressive Episode but the period of remission has been less than 2 months). Moreover, while the Third Circuit stated in the *Fargnoli* case cited by the Commissioner that it does "not expect the ALJ to make reference to every relevant treatment note in a case where the claimant … has voluminous medical records," *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001), it does "expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law." *Id.* Moreover, in *Fargnoli*, the court vacated the ALJ's decision precisely because of a failure by the ALJ to mention or discuss findings by a treating physician that were consistent with the claimant's complaints. *Id.* at 43-44.

Given that Dr. Zoratti's report accompanied and provided context for the Medical Source Statement, we agree with Plaintiff that the ALJ's failure to manifest any consideration of that report when determining that the Medical Source Statement warranted "little weight" reflects a departure from the ALJ's responsibility as set out in the Regulations and Rulings. Contrary to the

Commissioner's contention in her brief, the information in the report was not cumulative nor already contained in her progress notes and the Medical Source Statement. The progress notes from this time principally describe only her sleeping and her general mood as improved with medications --- they do not, for example, provide any insight into Plaintiff's activities of daily living. *See, e.g.,* R. 292 (note of 5/7/08); R. 289 (note of 6/4/08, referring to appropriate affect but depression during the day). *Cf.* R. 282 (responses in report on panic attacks and activities of daily living). In short, we believe the failure of the ALJ to show consideration of the report that accompanied Dr. Zoratti's Medical Source Statement amounts to legal error and constitutes a basis for remand.

### B. The ALJ's rejection of the opinions of treating psychiatrists Dr. Zoratti and Dr. Herran

Plaintiff next contends more broadly that the ALJ erred in rejecting opinions offered by both Dr. Zoratti of COMHAR and Dr. Herran of Cognitive-Behavioral Services, Inc., in that the rationales given lacked specific explanations, failed to take into account psychotherapy treatment notes from the relevant time period, or were based on what Plaintiff characterizes as a selective reading of the doctor's treatment notes and a mischaracterization of the record. She contends that these defects rendered the ALJ's explanation for the weight given to the opinions to be legally deficient. The Commissioner contends that the ALJ was within her right to discount these opinions for the reasons she gave in her decision, and which were supported by the record. She argues that the ALJ reasonably gave little weight to these doctors' assessments because they were not consistent with the overall probative evidence of record and that it was appropriate for her to instead give weight to the state agency reviewing psychologist's opinion as consistent with the overall evidence. (Def. Br. at 6-9.)

### 1. Dr. Zoratti

As discussed above, Dr. Zoratti provided a Medical Source Statement on June 4, 2008, in which she opined that "[Mendez] had extreme limitations in understanding and remembering detail[ed] instructions, carrying out detailed instructions, responding appropriately to work pressures in a routine work setting, and responding appropriately to changes in a usual work setting," and that she "had marked limitations in making judgments on simple work-related decisions and interacting appropriately with supervisors and co-workers." (R. 38 (citing Exhibit 7F).) The ALJ explained that she gave "[l]ittle weight … to Dr. Zoratti's opinion because it is inconsistent with mental health treatment records at the time of the opinion that indicated that the claimant's major depressive disorder was in partial remission." (*Id.* (citing Exhibit 8F at 1-19, 6, 9, 12, 16).)

Plaintiff recognizes that an ALJ is required to give a treating source's opinion on the issue of the nature and severity of the claimant's impairment "controlling weight" *only if* that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record. *See* Pl. Br. at 8 (citing 20 C.F.R. §§ 404.1527(d)(2) (2004)). A medical opinion will qualify as "well-supported by medically acceptable clinical and laboratory diagnostic techniques" based upon the particular findings and what they signify. The opinion need not be "fully supported" by such evidence in order to be "well-supported." SSR 96-2p, 1996 WL 374188, *2 (July 2, 1996). Even if a treating source's medical opinion is not entitled to controlling weight because it is either not well-supported or is inconsistent with the other substantial evidence in the record, it is "still entitled to deference" and must be weighed using all of the factors provided in 20 C.F.R. § 416.927. *Id.* at *4.

In giving "little weight" to Dr. Zoratti's opinion, the ALJ determined that Mendez had no limitations in making judgments on simple decisions, where Dr. Zoratti found marked limitations; only moderate limitations in interacting with others, where Dr. Zoratti found moderate to marked limitations; and no limitations in dealing with work pressure and changes, where Dr. Zoratti found extreme limitations. *Compare* R. 37 (ALJ decision endorsing opinion of state agency reviewing psychologist, found at R. 333-34) *with* R. 285 (Dr. Zoratti opinion). Plaintiff correctly observes that "[t]he sole reason provided" by the ALJ for giving "little weight" to Dr. Zoratti "was that the mental health records showed that Ms. Mendez's depression was in partial remission." (Pl. Br. at 10.)[9] She argues that the context provided in the contemporaneous report shows that while Plaintiff's symptoms may have improved sufficiently with treatment to justify the "partial remission" descriptor for her diagnosis for her Major Depressive Disorder, Severe, Recurrent, they had improved only insofar as she was no longer a candidate for hospitalization --- not that she could withstand the stresses of working. (Pl. Br. at 10-11.) She also contends that the ALJ's stated rationale for rejecting Dr. Zoratti's opinion is inadequate because the ALJ did not demonstrate that she considered the treatment notes of Plaintiff's therapist during the period of

---

[9] In an extended discussion of the record that grew out of the ALJ's explanation for her credibility determination, the ALJ noted as to Dr. Zoratti:

> Treatment notes from psychiatrist Dr. Zoratti show that the claimant's major depressive disorder was in partial remission from January of 2008 [the alleged onset date] through June of 2008 [the conclusion of the COMHAR records, and when the opinion was offered]. (Exhibit 8F at 1-19). During this period, it was noted that the claimant's medications improved her mood and that she was sleeping very well. The claimant denied suicidal or homicidal ideation or hallucination. (Exhibit 8F at 6, 9, 12, 16).

(R. 36.)

time covered by Dr. Zoratti's report, which refer to difficulty "dealing with the stress of life" and ongoing symptoms of nervousness, sadness, difficulty sleeping, tearfulness, and lack of energy. (Pl. Br. at 11.)

We share Plaintiff's concern about the thin explanation offered by the ALJ for her discounting of Dr. Zoratti's opinion, as the record of Mendez's psychotherapy treatment at COMHAR shows ongoing complaints and the psychiatric progress notes show continuous alterations in or additions to the medication regimen over her two years of treatment there, notwithstanding the diagnosis throughout that time that included the "partial remission" reference. We agree that this issue warrants further consideration upon remand.

## 2. Dr. Herran

Plaintiff also contends that the ALJ improperly rejected an opinion offered on February 18, 2010 [10] by Onilda Herran, M.D., who was her treating psychiatrist at the time at Cognitive-Behavioral Services, Inc. Dr. Herran offered her assessment in a Medical Source Statement in which she reported that Mendez suffered from Major Depressive Disorder, Recurrent, Severe, Without Psychosis, as well as PTSD, and that her symptoms included poor memory, appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional lability, decreased energy, difficulty thinking or concentrating, persistent irrational fears, generalized persistent anxiety, hostility and irritability, and fatigue. (R. 364-65.) She identified the four medications that she prescribed for Mendez --- Klonopin, Ambien, Topomax, and Prozac --- and reported Mendez's prognosis as "guarded." (R. 366.) On a portion of the form asking her

---

[10] This document appears to bear the date "12-18-10" but is described in the exhibit list as dated "2-18-10." As this document was included in the record that was before the ALJ at the time of April 1, 2010 hearing, it could not have been completed on December 18, 2010.

to rate Mendez's ability to perform twenty-five various activities on a scale of "unlimited or very good," "good," "fair," and "poor or none," she rated Mendez as "good" as to two, "fair" as to fifteen, and "poor or none," which was defined as "no useful ability to function in this area," with respect to seven abilities. (R. 367-68.) When asked in the form to explain limitations that fell into the "fair" and "poor" categories and the findings that support that assessment, Dr. Herran answered: "asthma, scoliosis, severe chronic lumbar pain." (R. 368.) When asked to estimate how often, on average, Mendez's impairments or treatment would cause her to be absent from work with reference to six choices ranging from "never" to "more than three times a month," she selected "more than three times a month." (R. 367.)

In her discussion of the opinion evidence, the ALJ provided the following analysis of Dr. Herran's contribution to the record:

> Dr. Onilda Herran completed a mental impairment questionnaire suggesting the claimant would be absent from work more than three times per month because of her mental impairments. Dr. Herran opined that the claimant had poor or no ability to perform the following mental work-related activities: maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; deal with stress of semiskilled and skilled work; travel in unfamiliar places; and use public transportation. (Exhibit 15F). Dr. Herran's questionnaire is given little weight because it is not supported by recent mental health treatment records. Although the records show that the claimant was worried about her family and was depressed, it also showed that she was sleeping well, had no medication side effects, reported feeling better, as well as having a full affect and goal direct[ed] thought processes. (Exhibit 16F at 21, 22, 23, 24, 25, 26).

(R. 38.) Plaintiff characterizes this as a "simplistic explanation" that relies on "a selective reading of Dr. Herran's treatment notes and, as such, constitutes a mischaracterization of the record." (Pl.

Br. at 12.)   She reiterates that an explanation for the rejection of a treating psychiatrist's opinion that is based upon a mischaracterization of the records is not an adequate explanation and that it could not justify the ALJ's rejection of an opinion that should be entitled to great deference.   (*Id.* at 13.)

The evidence cited by the ALJ in support of her determination that Dr. Herran's February 18, 2010 opinion was "not supported by recent mental health treatment records" is found at pages 390-95 of the record.   This evidence is comprised of six consecutive "Psychiatric Progress Notes" completed by Dr. Herran on May 12, May 27, July 18, August 17, September 14, and October 13, 2009.   The cited records provide support for many of the particular representations made by the ALJ,[11] although collectively they paint a portrait of inconsistent progress, with a bout of insomnia, irritability, psychomotor agitation, tearful demeanor, and a mood described as "sad," "worried," and "anxious" featured in the middle of this period.   *See* R. 393 (7/18/09).   Most significantly, however, the records cited by the ALJ cannot fairly be described as "recent mental health treatment records" in relation to Dr. Herran's February 18, 2010 opinion, particularly when compared to the latest progress notes and treatment plan update contained in the record.   Later progress notes show: that Mendez was "sedated due to medications" at her appointment on November 13, 2009, although Dr. Herran also characterized her affect as "anxious" and her insight

---

[11]  For example, the records do memorialize that Mendez was worried about her family.   Several notes indicate that she was sleeping well, albeit not on July 18, 2009, when she reported insomnia. *See* R. 393.   Mendez confirmed that she had no medication side effects on three visits, including following an increase in medications.   *See* R. 394 (5/27/09), 392 (8/17/09), 390 (10/13/09).   She did report "feeling better" or "well" on two occasions during the time period cited by the ALJ. *See* R. 392 (8/17/09), 390 (10/13/09).   Her thought process was described as "goal directed" at each of these visits.   Finally, she was noted as having a "full" affect at several visits, *see* R. 394 (5/27/09), 392 (8/17/09), 390 (10/13/09)) --- except when she was noted to be "depressed" or "dysphoric."   *See* R. 391 (9/14/09), 393 (7/18/09).

as "limited." (R. 389.) Mendez reported at that time that she wanted to decrease Klonopin, although the increased dosage was resumed at her next check-up on December 18, 2009 to increase its efficacy, and her psychotherapy regimen was also increased at that time from once a week to twice a week. (R. 388.) Mendez was observed at the December 18 visit as presenting with a dysphoric affect, with a sad, worried, and anxious mood. (R. 388.) She reported that she was not sleeping well. (R. 388.) In addition, a treatment plan completed on November 18, 2009 by Dr. Herran, in conjunction with Mendez and psychotherapist Nurys Gomez, memorialized that Mendez reported that she felt "so lonely," was "never happy," "cr[ies] very often 2, 3 times a week," and that her "energy is so low." (R. 385.) In addition, and contrary to the ALJ's pronouncement that Mendez was "sleeping well," she also complained that she still was "not sleeping well," as she had difficulty falling and staying asleep for even 4-5 hours a night. (R. 386.)

We agree with Plaintiff that the ALJ did not provide a factually-supported, record-based reason for her rejection of Dr. Herran's opinion. The weight given to this opinion must be re-considered on remand.

### C.    The ALJ's rejection of Plaintiff's testimony as not fully credible

Finally, Plaintiff complains that the ALJ erred in discounting her testimony regarding the severity of her mental impairments and their effect on her daily activities and functional capacity. She claims that this error derives from the ALJ's erroneous reading of the mental health treatment record that resulted in the rejection of the opinions of Drs. Zoratti and Herran as discussed above. (Pl. Br. at 14.)

The ALJ's credibility finding was based not only on Mendez's statements regarding her

mental health symptoms as compared to the mental health treatment records, but also her statements regarding the severity of pain that she claimed arose from physical impairments. *See* R. 36 ("The claimant's allegations regarding the severity of her pain and mental health symptoms are unsupported by her treatment records."). Plaintiff does not address the extent to which the ALJ's overall credibility assessment was supported for the reasons given in the paragraph in which she examined Plaintiff's use of a cane and reports of "constant" back pain and "constant" difficulty with asthma. *See* R. 36. However, inasmuch as the ALJ's discussion of credibility proceeded to describe Plaintiff's GAF scores at various times (*see* R. 36), Dr. Zoratti's treatment notes (*see* R. 36 (citing Ex. 8F)), and Dr. Herran's treatment notes (*see* R. 37 (citing Ex. 16F)), we accept Plaintiff's proposition that the errors in the ALJ's evaluation of the treating psychiatrists' opinions impacts upon her credibility assessment and will require reconsideration upon remand.

## V.     CONCLUSION

As set forth above, we have concluded that the ALJ's rejection of critical treating psychiatrist opinions failed to reflect review of a contemporaneous report (in the case of Dr. Zoratti) or was based upon a mischaracterization of the record cited in support thereof (in the case of Dr. Herran). These errors require further proceedings on remand, at which time the ALJ may consider those opinions, as well as assess Plaintiff's credibility, in light of the record as a whole. Our recommendation follows.[12]

---

[12] We do not find this case to present a basis for the Court to direct an award of benefits, as Plaintiff requests. *See* Pl. Br. at 15 (citing, *inter alia*, *Dorf v. Bowen*, 794 F.2d 896 (3d Cir. 1986)). Mendez's claim has not involved a history of delayed adjudication, nor would we characterize further proceedings as "an exercise in futility." *Dorf*, 794 F.2d at 903. *See also id.* (awarding benefits in a "long and tortured case, spanning almost 20 years" and after multiple hearings with substantial evidence of the plaintiff's disability).

## RECOMMENDATION

**AND NOW**, this 8th day of August, 2013, upon consideration of the brief in support of review filed by Plaintiff, Defendant's response thereto, and Plaintiff's reply thereto (Doc. Nos. 13, 16 & 19), as well as the administrative record, it is respectfully **RECOMMENDED** that Plaintiff's request for review be **GRANTED**, the decision of the Commissioner be **VACATED**, and the matter be **REMANDED** for further proceedings consistent with this Report.

BY THE COURT:


/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE